FILED BY ___ AT ___ D.C.

**Aug 21, 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

NJM:GMR/DIB
F. #2023R00979

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

MAXIM LARIN and
███████████████████

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
*AUGUST 5, 2025*
BROOKLYN OFFICE

OUR CASE NO: 25-6504-MJ-AUGUSTIN-BIRCH

I N D I C T M E N T

Cr. No.  25-cr-00246
(T. 13, U.S.C., §§ 305(a)(1) and 305(a)(3);
T. 18, U.S.C., §§ 371, 554(a),
981(a)(1)(C), 982(a)(1), 982(b)(1),
1956(h), 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 22, U.S.C., §§ 401,
2778(b)(2) and 2778(c); T. 28, U.S.C.,
§ 2461(c); T. 50, U.S.C., §§ 4819(a)(1),
4819(a)(2)(D), 4819(b), 4819(d)(1) and
4819(d)(2); T. 15, C.F.R., §§ 736.2(b)(1)
742.4(a)(1)–(2)) and 764.2; T. 22, C.F.R.,
Parts 121 and 127)

Judge Nina R. Morrison
Magistrate Judge Marcia M. Henry

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    **The Defendants**

    1.    The defendant MAXIM LARIN was a naturalized United States citizen originally from Russia residing in Plantation, Florida.   LARIN owned and controlled several United States-based companies, including Subject Company-1 and Subject Company-2, entities the identities of which are known to the Grand Jury, which sold firearms parts and accessories.

    2.    The defendant ███████████████████████ was a Russian national residing in Saint Petersburg, Russia.   ████████ facilitated the shipment of tactical supplies and military equipment to Kazakhstan, a known transshipment point for items destined for Russia.   Some of the goods, including items supplied by the defendant MAXIM

LARIN, were subject to United States export controls which prohibited their shipment to Kazakhstan without an export license.

II.    The Statutory and Regulatory Background

    A.    The Export Control Reform Act and Export Administration Regulations

       3.    The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, which were promulgated by the U.S. Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), regulated the export of goods, technology and software from the United States.   Under the Export Control Reform Act ("ECRA"), it was a crime to violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR.   See 50 U.S.C. § 4819(a)(1). Willful violations of the EAR constituted criminal offenses under the ECRA.   See 50 U.S.C. § 4819(b).

       4.    Through the EAR, the BIS reviewed and controlled the export from the United States to foreign countries of certain U.S. items.   See 15 C.F.R. §§ 734.2-.3.   In particular, the BIS placed restrictions on the export and re-export of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

       5.    The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.   Items listed on the CCL were categorized by Export Control

Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user.

      B.      <u>The Arms Export Control Act and the International Traffic in Arms Regulations</u>

      6.      In furtherance of the national security and foreign policy interests of the United States, the export of defense-related articles was regulated by the Arms Export Control Act ("AECA"), Title 22, United States Code, Section 2778.   Section 2778(a) authorized the President of the United States to control the import and export of defense articles and to establish a United States Munitions List ("USML"), which identified and defined the defense articles subject to those controls.   Section 2778(b) provided that no defense articles could be exported without a license.   Section 2778(c) established criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder.

      7.      The United States Department of State, through the Directorate of Trade Controls ("DDTC"), implemented these statutory provisions by adopting the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120-130. These regulations established the USML and required an export license from the DDTC for the export of any items on the USML.

      8.      "Defense articles," as that term is used in Title 22, United States Code, Section 2778(b)(2) and the ITAR, means items, including technical data, designated for placement on the USML as weapons, weapons systems, aircraft, launch vehicles, missiles, bombs and other implements of war.   With limited exceptions for the closest military allies of the United States, a person or entity seeking to export from the United States designated "defense articles" on the USML must receive a license or other approval from the DDTC.

III.   <u>Overview of the Criminal Scheme</u>

9.      Since in or about December 2022, the defendant ███████████ participated in a fraudulent scheme in connection with the unlawful procurement and international shipment of export-controlled firearms parts and accessories.   The export-controlled items were procured from United States suppliers and then shipped to locations outside of the United States, including Kazakhstan.   ███████████ who was a resident of St. Petersburg, Russia, corresponded with suppliers of tactical and military equipment about the shipment of the items, including to others in the United States and abroad.   These items were ultimately shipped internationally, usually to Kazakhstan.   Items sent to Kazakhstan were addressed to Coconspirator-1 or Coconspirator-2, individuals whose identities are known to the Grand Jury, at addresses which were close in proximity to the Russian border.

10.      Many of the items procured by the defendant ███████████ were on the CCL or USML and were subject to licensing requirements administered by the BIS or DDTC, respectively.   ███████████ did not and had never possessed the licenses required to ship these items internationally.   ███████████ and his coconspirators circumvented and attempted to circumvent the requirements of U.S. export laws by using persons based in the United States, including Coconspirator-3 and Coconspirator-4, individuals whose identities are known to the Grand Jury, to receive and then reship merchandise out of the United States.   The scheme also relied upon United States-based freight forwarders to facilitate the international shipment of export-controlled items.   At times, individuals involved in the scheme, including Coconspirator-3 and Coconspirator-4, used shipping labels produced by an electronic postage account subscribed to by Coconspirator-5, an individual whose identity is known to the Grand Jury.   The scheme resulted in the international shipment of items on the CCL and the attempted

shipment of items subject to the ITAR without the required licenses, all in violation of United States export control laws.

11.      As part of the scheme, the defendant ███████████ regularly requested and instructed that United States suppliers, including the defendant MAXIM LARIN, provide misleading descriptions and values to United States customs officials for the contents of parcels being exported.   The descriptions did not reflect the true nature of the tactical and military equipment being shipped and obstructed efforts by United States authorities to enforce export laws.   The declared value of the merchandise was also misrepresented.   Therefore, United States customs records reflected that the items shipped had values which were thousands of dollars less than the true value of the items contained in the shipments.   While certain United States suppliers declined ███████████ requests and instructions, LARIN agreed to misrepresent and devalue the contents of multiple international shipments containing merchandise purchased by ███████████.

IV.      <u>Procurement of Export Controlled Items</u>

A.      ███████████ <u>and LARIN Agreed to Misrepresent the Contents and Value of Shipments to Kazakhstan</u>

12.      In or about December 2022, the defendant ███████████ created a customer account with Subject Company-1, the defendant MAXIM LARIN's Florida-based company.   Although ███████████ created the account and it was associated with his email address, the account was created in the name of Coconspirator-1.   After creating the account, ███████████ ordered approximately twelve sets of tactical headsets, with a total value of approximately $5,989.40, and directed that they be shipped to Coconspirator-1 in Actobe, Kazakhstan, a city located close to the Russian border.   LARIN then contacted ███████████ through email and asked him in sum and substance how he would like to declare his order to

United States customs. ███████████ responded and said, "If it's not difficult for you, could you put the name 'gaming headphones.'" ███████████ further asked that the declared value be stated as $970.   LARIN replied to ███████████ and said, "we can do that."   LARIN later shipped the order and ███████████ confirmed its receipt.   Export records from United States Customs and Border Protection ("CBP") reflected that the order's description was given as "headphones" with a declared value of $80.   These records further reflected that the order departed the United States from John F. Kennedy International Airport ("JFK Airport") in the Eastern District of New York on or about December 22, 2022.

13.    In or about December 2022, as part of an exchange of emails, the defendant MAXIM LARIN wrote to the defendant ███████████, "the packages show the soldiers on them.   It may be a red flag for the customs if they open it.   Would you like us to remove the package boxes, or to take a risk with the customs?" ███████████ responded and said to LARIN, "Please do not need to change the packaging boxes.   I think everything will be fine.   I have already ordered headphones many times and have not experienced any problems."

14.    In or about March 2023, the defendant ███████████ ordered firearms parts and accessories for Glock pistols and AR rifles from the defendant MAXIM LARIN's company, Subject Company-1.   An invoice for this order stated that the total value of the items ordered was $1,876.39.   These items were eventually shipped to Coconspirator-1 in Kazakhstan.   In connection with this order, LARIN sent an email to ███████████ which stated in part, "We can ship it, however US customs can seize it, as it is up to the customs officer whether to consider it an accessory and pass it or a gun part and confiscate it."   In response, ███████████ wrote LARIN and told him in sum and substance to write in the customs declaration that the package contained accessories for Airsoft, a non-lethal type of air powered

rifle, and to falsely state that the shipment's contents had a value of $180. ███████ later agreed with LARIN's suggestion to declare the package as "sporting goods."   Customs records reflected that the shipment's contents were incorrectly labeled as "sporting goods" with a value of $180.

     B.      **LARIN Filled ███████ Orders for Items on the CCL and Misrepresented The Nature of the Items Shipped and Their Value**

     15.     In or about May 2023, the defendant ███████ ordered more firearms accessories from the defendant MAXIM LARIN to be delivered to Coconspirator-1 in Kazakhstan.   Email correspondence between ███████ and LARIN showed that this order contained Geissele super semi-automatic enhanced triggers, a Geissele hi-speed trigger and a Geissele Airborne charging handle 5.56.   These items were included on the CCL at ECCN 0A501.c and 0A501 respectively, and could not be exported to Kazakhstan (or Russia) without a license from DOC.   Neither ███████, LARIN, nor Coconspirator-1 possessed the required license.   Email correspondence between ███████ and LARIN showed that in connection with this order, LARIN stated to ███████, "Last time it got returned . . . I am afraid we can face the same issue.   How would you like to get it declared?" ███████ then responded and instructed LARIN to mislabel the contents of the order to state the package contained "Mans Pant (sic), Womans Pant (sic), Mans Jacket (sic), Womans Jacket (sic), Gaming Headphones, Construction Tools, Aluminum Tube, small flashlight, light switch" with a cost "up to $950." In truth, the value of the order was approximately $6,985.50.   Customs records reflected that the order was shipped to Coconspirator-1 in Kazakhstan with its contents listed as "light switch." The order transited through JFK Airport in the Eastern District of New York on or about June 13, 2023.

16.    In or about October 2023, the defendant ██████████ changed the identity of the recipient of the orders he placed with the defendant MAXIM LARIN's company, Subject Company-1, to Coconspirator-2 at an address in Uralsk, Kazakhstan which was close to the Russian border.   Emails showed that in or about October 2023, LARIN shipped an order placed by ██████████ to Coconspirator-2.   The order included a strike AR-15/M16 forward assist, an Apex action enhancement trigger kit for a Glock firearm and a Radian Raptor charging handle 5.56.   These items were all included on the CCL at ECCNs 0A501.x, 0A501.c and 0A501 respectively, and could not be exported to Kazakhstan without a license from DOC. Neither LARIN, ██████████, nor Coconspirator-2 possessed the required license.

17.    In or about January 2024, the defendant ██████████ placed an order from Subject Company-1, which included, among other things, Geissele super semi automatic enhanced triggers.   An invoice for the order lists Coconspirator-2 as the recipient of the order in Kazakhstan.   The Geissele super semi automatic enhanced trigger is included on the CCL at ECCN 0A501.c and could not be shipped to Kazakhstan (or Russia) without a license. Neither the defendant MAXIM LARIN, ██████████, nor Coconspirator-2 possessed the required license.

C.    **The Defendants Conspire to Export an ITAR Controlled Target Acquisition System**

18.    In or about December 2023, the defendant ██████████ emailed the defendant MAXIM LARIN and asked him to obtain a Rapid Targeting and Ranging Module target acquisition device ("Raptar S") manufactured by a United States company based in New Hampshire, an entity the identity of which is known to the Grand Jury ("U.S. Manufacturer-1"). ██████████ requested that LARIN establish a relationship with a dealer of the device to facilitate ██████████ purchase of it.

19.    The Raptar S was a firearms accessory which assisted users in acquiring targets at extremely long ranges.   It was included on the USML within category XII(c)(2)(iv) and could not be exported from the United States without a license from DDTC.   Neither the defendant MAXIM LARIN, the defendant ███████████ nor their coconspirators possessed the required license.

20.    In connection with the defendant ███████████ request, the defendant MAXIM LARIN established a relationship with a Florida-based distributor of night vision equipment and a dealer of the device, an entity the identity of which is known to the Grand Jury ("U.S. Supplier-1").   In conjunction with this business agreement, LARIN signed an agreement with U.S. Supplier-1.   Among other provisions, the agreement stated in sum and substance that export of commodities covered by the ITAR was prohibited without a valid export license issued by DDTC.

21.    In or about January 2024, the defendant MAXIM LARIN contacted the defendant ███████████ and told him that he had established a relationship with a dealer to acquire the Raptar S.   LARIN provided ███████████ a link to facilitate payment for the Raptar S and stated that the price included a credit card processing fee.   ███████████ asked LARIN to include the Raptar S in a shipment with another of ███████████ orders.   LARIN declined to do so and stated in sum and substance, that he could not ship it outside of the country and asked for an address in the United States.   However, LARIN was aware of ███████████ history of purchasing items and having them shipped to locations in Kazakhstan.

22.    Following the defendant ███████████ payment for the Raptar S, the defendant MAXIM LARIN paid U.S. Supplier-1 for the device.   The invoice generated in connection with this transaction contained the following admonition at the bottom: "[U.S.

Supplier-1's] products are subject to export and foreign trade control laws of the United States. These include the International Traffic in Arms Regulations (22 C.F.R. § 120-130 'ITAR'), the Export Administration Regulations (15 C.F.R. § 730-744, 'EAR'), statutes that provide authority for the ITAR and EAR, and economic sanctions laws and regulations administered by the United States Government . . . ."

  23. The defendant MAXIM LARIN received the Raptar S from U.S. Supplier-1, emailed the defendant ███ and stated in substance that the device had arrived. At ██ request, LARIN emailed ██ photos of the device. Several of these photos are included below:



  24. The defendant MAXIM LARIN emailed the defendant ██ and wrote, "I look forward for the address for the Raptar." Later in the same email, LARIN acknowledged that he knew that items ██ purchased were intended for export when he wrote, "Finally, I wanted to inform you that we assessed the risks and decided that we can not [sic] ship outside the country. The export laws are really complicated and really strict, and we don't want to get into the troubles. I would suggest you to find a freight forwarder or use someone in the US for future shipments."

25.     Subsequently, the defendant ██████████ instructed the defendant MAXIM LARIN to ship the Raptar S to Coconspirator-3 in Oregon.   LARIN later sent ██████████ a photograph of the label for the package containing the Raptar S.   The label showed that the package was addressed to Coconspirator-3.

26.     Coconspirator-3 later received the package containing the Raptar S.   After receiving it, Coconspirator-3 took a photograph of the package which contained the same label depicted in the photograph which the defendant MAXIM LARIN had sent to the defendant ████ ██████████.   Coconspirator-3 then repackaged the Raptar S and several instructional manuals accompanying it and shipped it to Coconspirator-2 in Kazakhstan.

27.     In March 2024, the Raptar S shipped by Coconspirator-3 to Coconspriator-2 was intercepted by law enforcement at a freight forwarding facility in Los Angeles, California.   Following its interception, law enforcement opened the package and recovered the Raptar S and the instruction manuals accompanying it.   The manuals contained clear warnings on their front covers that the product was subject to the ITAR and could not be exported from the United States without a license.

**COUNT ONE**
(Conspiracy to Defraud the United States)

28.     The allegations contained in paragraphs one through 27 are realleged and incorporated as if fully set forth in this paragraph.

29.     In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ██████████████████████████ together with others, did knowingly and willfully conspire to defraud the United States by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful functions

of BIS and DDTC, both agencies of the United States, in the enforcement of export control laws and regulations, and the issuance of licenses relating to the export of goods.

30.     In furtherance of the conspiracy and to affect its objects, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ████ ████████████████████████████ together with others, committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

(a)     On or about December 10, 2022, ████████ created an online account with LARIN's company, Subject Company-1, in the name of Coconspirator-1.

(b)     On or about May 26, 2023, ████████ placed an order with LARIN's company for, among other things, Geissele super semi automatic enhanced triggers and a Geissele Airborne charging handle 5.56, which are included on the CCL.

(c)     On or about May 26, 2023, ████████ emailed LARIN and said in sum and substance that he had just placed an order and needed delivery to Kazakhstan.

(d)     On or about May 27, 2023, LARIN emailed ████████ and said in sum and substance that a prior order had been returned, he was concerned they would face the same issue, and asked how ████████ would like the order declared in order to avoid detection by United States authorities.

(e)     On or about May 27, 2023, ████████ emailed LARIN and instructed him in sum and substance to falsely declare his order and state it contained clothing, tools, aluminum tubes, and a light switch.

(f)     In or about June 2023, LARIN caused a shipment to be sent to Coconspirator-1 in Kazakhstan, at ▆▆▆▆▆ request, which was falsely declared as containing a "light switch," but which contained items listed on the CCL.

(g)     On or about October 5, 2023, ▆▆▆▆▆ placed an order with LARIN's company for, among other things, a strike AR-15/M16 forward assist, an Apex action enhancement trigger kit for a Glock firearm and a Radian Raptor charging handle, which are included on the CCL.

(h)     In or about October 2023, LARIN caused a shipment containing the strike AR-15/M16 forward assist, an Apex action enhancement trigger kit for a Glock firearm and a Radian Raptor charging handle to be sent to Coconspirator-2 in Kazakhstan.

(i)     In or about December 2023, ▆▆▆▆▆ emailed LARIN and asked him to establish a relationship with a dealer of ITAR-controlled Raptar S target acquisition devices.

(j)     On or about January 17, 2024, ▆▆▆▆▆ paid LARIN for the purchase of an ITAR-controlled Raptar S target acquisition device.

(k)     On or about January 18, 2024, LARIN purchased a Raptar S target acquisition device on ▆▆▆▆▆ behalf.

(l)     In or about January 2024, ▆▆▆▆▆ placed an order from LARIN's company for a Geissele super semi-automatic enhanced trigger, an item included on the CCL.

(m)     On or about January 22, 2024, LARIN's company accepted ▆▆▆▆▆ order for a Geissele super semi-automatic enhanced trigger.

14

  (n)  On or about January 24, 2024, ███████ emailed LARIN and instructed him to ship the Raptar S target acquisition device to Coconspirator-3 in Oregon.

  (o)  On or about February 3, 2024, LARIN emailed ███████ a photo of the shipping label for the Raptar target acquisition device which was addressed to Coconspirator-3.

  (p)  In or about February 2024, Coconspirator-3 received a package from LARIN which was shipped using a label, a picture of which was previously sent by LARIN to ███████.

  (q)  In or about March 2024, Coconspirator-3 shipped a package containing a Raptar S target acquisition device to Coconspirator-3 in Kazakhstan.

   (Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TWO
#### (Conspiracy to Violate ECRA)

  31.  The allegations contained in paragraphs one through 27 are realleged and incorporated as if fully set forth in this paragraph.

  32.  In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ███████████████████ together with others, did knowingly and willfully conspire to export and cause to be exported from the United States to Kazakhstan items on the Commerce Control List set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, without having first obtained a license for

such export from the U.S. Department of Commerce contrary to Title 50, United States Code, Section 4819(a)(1).

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(D) and 4819(b); Title 15, Code of Federal Regulations, Sections 736.2(b)(1), 742.4(a)(1)–(2) and 764.2; and Title 18, United States Code, Sections 3551 et seq.)

**COUNT THREE**
(Conspiracy to Violate the AECA)

33.    The allegations contained in paragraphs one through 27 are realleged and incorporated as if fully set forth in this paragraph.

34.    In or about and between December 2023 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ██████████████████████ together with others, did knowingly and willfully conspire to export and cause to be exported from the United States to locations outside thereof defense articles which were listed on the USML, to wit: a Raptor S, without first obtaining the required license or written approval from the State Department, contrary to Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations, Parts 121 and 127.

35.    In furtherance of the conspiracy and to affect its objects, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ████ ██████████████████ together with others, committed and caused the commission of, among others, the following:

## OVERT ACTS

(a)     On or about December 2023, ▮▮▮▮▮▮▮ emailed LARIN and asked him to establish a relationship with a dealer of ITAR-controlled Raptar S target acquisition devices.

(b)     On or about January 17, 2024, ▮▮▮▮▮▮▮ paid LARIN for the purchase of an ITAR-controlled Raptar S target acquisition device.

(c)     On or about January 18, 2024, LARIN purchased a Raptar S target acquisition device on ▮▮▮▮▮▮▮ behalf.

(d)     On or about January 24, 2024, LARIN emailed ▮▮▮▮▮▮▮ and stated in substance that the Raptar S target acquisition device had arrived.

(e)     On or about January 24, 2024, ▮▮▮▮▮▮▮ emailed LARIN and instructed him to ship the Raptar S target acquisition device to Coconspirator-3 in Oregon.

(f)     On or about February 3, 2024, LARIN emailed ▮▮▮▮▮▮▮ a photo of the shipping label for the Raptar S target acquisition device which was addressed to Coconspirator-3.

(g)     In or about February 2024, Coconspirator-3 received a package from LARIN which was shipped using a label, a picture of which was previously sent by LARIN to ▮▮▮▮▮▮▮ in reference to the Raptar S device.

(h)     In or about March 2024, Coconspirator-3 shipped a package containing the Raptar S target acquisition device acquired by LARIN on ▮▮▮▮▮▮▮ behalf to Coconspirator-2 in Kazakhstan.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FOUR
### (Attempted AECA Violation)

36.     The allegations contained in paragraphs one through 27 are realleged and incorporated as if fully set forth in this paragraph.

37.     In or about and between December 2023 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MAXIM LARIN and ███████████████████████████ together with others, did knowingly and willfully attempt to export from the United States to locations outside thereof one or more defense articles, designated on the USML, to wit: a Raptar S, without first obtaining the required license or written approval from the State Department.

(Title 22, United States Code, Sections 2778(b)(2) and 2778(c); Title 22, Code of Federal Regulations, Parts 121 and 127; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS FIVE THROUGH SIX
### (Smuggling Goods from the United States)

38.     The allegations contained in paragraphs one through 27 are realleged and incorporated as if fully set forth in this paragraph.

39.     On or about the dates listed below and within the districts specified below, the defendants MAXIM LARIN and ███████████████████████████ together with others, did knowingly and fraudulently export and send from the United States, merchandise, articles and objects, to wit: items on the Commerce Control List set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1, contrary to United States laws and regulations, to wit: Title 50, United States Code, Sections 4819 and Title 15, Code of Federal Regulations, Sections 730 et seq. and did fraudulently and knowingly receive, conceal and

facilitate the transportation and concealment of such merchandise, articles and objects, prior to

exportation, knowing the same to be intended for exportation contrary to such United States laws

and regulations.

| Count | Approximate Date | Type of Commodity | Location |
|-------|------------------|-------------------|----------|
| FIVE | June 2023 | Firearms Triggers and Accessories | Eastern District of New York |
| SIX | October 2023 | Firearms Triggers and Accessories | Northern District of Illinois |

(Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

## COUNTS SEVEN THROUGH EIGHT
### (Submission of False Export Information)

40.     The allegations contained in paragraphs one through 27 are realleged and

incorporated as if fully set forth in this paragraph.

41.     On or about the dates listed below and within the districts specified below,

the defendants MAXIM LARIN and ███████████████████████

together with others, did knowingly submit false and misleading export information through

Shipper's Export Declarations and the Automated Export System relating to the international

shipments and attempted international shipments of firearms accessories from the United States

to Kazakhstan.

| Count | Approximate Date | Type of Commodity | Location |
|-------|------------------|-------------------|----------|
| SEVEN | June 2023 | Firearms Triggers and Accessories | Eastern District of New York |
| EIGHT | October 2023 | Firearms Triggers and Accessories | Northern District of Illinois |

(Title 13, United States Code, Section 305(a)(1); Title 18, United States Code,

Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT TWO

42.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 50, United States Code, Section 4819(d)(1), which requires any person convicted of such offense to forfeit any of the person's property: (a) used or intended to be used, in any manner, to commit or facilitate the offense; (b) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the offense; and/or (c) constituting an item or technology that was exported or intended to be exported in violation of the Export Control Reform Act.

43.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      (a)     cannot be located upon the exercise of due diligence;

      (b)     has been transferred or sold to, or deposited with, a third party;

      (c)     has been placed beyond the jurisdiction of the court;

      (d)     has been substantially diminished in value; or

      (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 50, United States Code, Section 4819(d)(2), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 50, United States Code, Sections 4819(d)(1) and 4819(d)(2); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS THREE AND FOUR

44.     The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts Three and Four, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses; and (b) Title 22, United States Code, Section 401 and Title 28, United States Code, Section 2461(c), which allow for the forfeiture of any arms or munitions of war or other articles that are intended to be or are being or have been exported or removed from the United States, or any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles.

45.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 22, United States Code, Section 401; Title 28, United States Code, Section 2461(c))

<u>CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNTS FIVE AND SIX</u>

46.     The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts Five and Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds traceable to such offenses.

47.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS SEVEN AND EIGHT

48.     The United States hereby gives notice to defendants that, upon their

conviction of either of the offenses charged in Counts Seven and Eight, the government will seek

forfeiture in accordance with Title 13, United States Code, Section 305(a)(3), which requires any

person convicted of such offenses to forfeit: (a) any of the person's interest in, security of, claim

against, or property or contractual rights of any kind in the goods or tangible items that were the

subject of the offenses; (b) any of the person's interest in, security of, claim against, or property

or contractual rights of any kind in tangible property that was used in the export or attempt to

export that was the subject of the offenses; and (c) any of the person's property constituting, or

derived from, any proceeds obtained directly or indirectly as a result of the violation.

49.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 13, United States Code, Section 305(a)(3); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

by: *Alexandra Smith, Assistant U.S. Attorney*
JOSEPH NOCELLA JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | Case No. | 25-cr-00246 |
| | ) | | Judge Nina R. Morrison |
| **MAXIM LARIN** | ) | | Magistrate Judge Marcia M. Henry |
| | ) | | |
| _Defendant_ | ) | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_   **MAXIM LARIN**                                                                                         ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Defraud the United States (18 U.S.C. § 371); Conspiracy to Violate the Export Control Reform Act (50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(D) and 4819(b); Conspiracy to Violate the Arms Export Control Act (18 U.S.C. § 371); Attempt to Violate the Arms Export Control Act  (22 U.S.C. § 2778(b)(2)); Smuggling Goods from the United States (18 U.S.C. § 554(a)); Submission of False Export Information (13 U.S.C. § 305(a)(1))

Date:   8/5/2025                              _Trevor Scripps_   on behalf of
                                                _Issuing officer's signature_

City and state:   Brooklyn, NY                    **Brenna Mahoney**, Clerk of Court
                                                _Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ at _(city and state)_ _____ . |
| Date: _____                    _____ |
|                                          _Arresting officer's signature_ |
|                                          _____ |
|                                          _Printed name and title_ |